UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CV-80569-CANNON/REINHART

RICARDO CASTRO,

         Plaintiff,

v.

KILOLO KIJAKAZI
Acting Commissioner for Social Security,

         Defendant.

_____/

## <u>REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 15)</u>

This matter is before the Court on the parties' cross motions for summary judgment filed by Ricardo Castro ("Plaintiff" or "Mr. Castro") (ECF NO. 14) and Kilolo Kijakazi, Acting Commissioner of the Social Security Administration ("Defendant" or "Commissioner") (ECF No. 15). I have reviewed the Parties' Motions for Summary Judgment as well as Plaintiff's Response (ECF No. 16). Under the limited standard of review that governs this case, I find that the motions are ripe for disposition and that substantial evidence supports the ALJ's determination. For the reasons stated below, Plaintiff's Motion for Summary Judgment (ECF No. 14) should be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 15) should be **GRANTED**, and the decision of the ALJ should be **AFFIRMED**.

## BACKGROUND

On August 7, 2018, Mr. Castro filed an application for a period of disability and Disability Insurance Benefits ("DIB") alleging a period of disability beginning on May 30, 2018. R. 92, 208.[1] Mr. Castro's initial application was denied, but upon appeal, he had a hearing before an Administrative Law Judge ("ALJ") on July 15, 2020. R. 40–75. Mr. Castro was represented by counsel Aaron Malamed at the hearing. R. 43.

The record contains the following facts adduced largely from Mr. Castro's testimony at the hearing and the testimony of a vocational expert ("VE"). Mr. Castro was 52 years old at the time of his alleged disability onset. R. 42, 208. He completed eighth grade and has past work experience as a concrete truck driver and heavy highway construction driver. R. 47–49, 236. Mr. Castro alleged the following physical or mental conditions limiting his ability to work: a heart attack in 2014, high blood pressure, high cholesterol, gastric bypass in 2017, asthma, deteriorating and bulging discs in neck and lower back, fractured right hip, kidney stones, and mental conditions. R. 77, 234. Mr. Castro testified that he suffered a heart attack when he was 46 years old. R. 51. In 2018 he "felt a lot of pressure" and suffered from headaches. In February 2020 he had a pacemaker installed, however, he reported that he still feels pain through his spinal cord and suffers from headaches. R. 51–53. Mr. Castro testified that he was prescribed heart medication but stopped taking it for a period of 6 to 8 months in 2019 when he did not have the funds to pay for the medication. R. 56. He was able to resume taking medication after going to the

---

[1] Citations preceded by "R." are to the administrative record filed at ECF No. 10.

Healthcare District, which, he testified is where he now receives his medication for free. R. 56–57.

Mr. Castro also testified that in November 2018, he suffered from a pulmonary embolism, for which he was put on medication to treat the condition and it ultimately resolved. R. 53. He reported that he does not have any lasting effects from the pulmonary embolism aside from light swelling in his left ankle that is exacerbated by standing for a long time and walking. R. 53–54. Mr. Castro reported that he does not currently take medication for the swelling. R. 54. Mr. Castro also testified that after recovering from the pulmonary embolism, but prior to having his pacemaker installed, he experienced shortness of breath, headaches, and tightness in the chest that was exacerbated by physical exertion and extreme heat or cold. R. 54–55.

Mr. Castro also testified that he had a gastric bypass procedure in 2017. R. 55. As a side effect of the procedure, Mr. Castro reported that he is limited in the types of foods he can eat. R. 56. He also testified that he fractured his hip in his twenties and fell off a warehouse, injuring his lower back, in his teen years, but he is not currently seeking treatment for those conditions. R. 58–59. He reported issues sleeping due to lower back pain and difficulty bending over the sink to do the dishes due to pain in his hip. R. 66–67.

Mr. Castro reported that he cannot lift anything heavier than a gallon of milk and can stand for about ten minutes before his back and hip are irritated. R. 59–61. Walking presents the same difficulties as standing for long periods of time. R. 61. Mr.

Castro reported that on average he takes about four Advil per day to treat the pain in his back and hip. *Id.*

When asked by the ALJ if he still smokes, Mr. Castro reported he stopped smoking over a year ago. R. 62. He also reported prior alcohol abuse but testified that he had been sober for sixteen months. *Id.* He testified that he entered inpatient rehab for alcohol abuse at the end of 2018 and has been clean since entering rehab. R. 63. He also testified that he has used cocaine before but not since entering rehab. R. 62–63.

Finally, Mr. Castro testified that he has suffered from depression and mood swings since 2017. R. 64. He also has been diagnosed with ADHD, which causes him to have trouble concentrating. R. 65.

At the hearing, the ALJ also heard testimony from Vocation Expert Beth Crane (the "VE"). After the VE described Mr. Castro's past relevant work positions, characterizing them both as "skilled" and "semi-skilled" and classified at the "medium level," the ALJ proceeded to ask the VE a series of hypotheticals. R. 70. In the first hypothetical, the ALJ asked the VE whether an individual Mr. Castro's age, with the same education and work experience, could perform the exertional demands of "light work." R. 71. Per the ALJ, the hypothetical claimant could only climb ramps and stairs, balance, stoop, kneel, crouch, and crawl occasionally; could never climb ladders, ropes, or scaffolds and should not be exposed to unprotected heights, moving mechanical parts, or extreme heat; he could have occasional exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and vibration. *Id.*

When asked whether the hypothetical claimant could perform any of Mr. Castro's past relevant work, the VE responded that he could not. *Id*. The VE also testified that, based on the hypothetical claimant with the same past jobs, there are no transferable skills. *Id*.

In the second hypothetical posed to the VE, the ALJ asked her to assume an individual the same age, education, and work experience as Mr. Castro, with the same limitations as the first hypothetical, except now to add the limitation that the individual can only understand, remember, and carry out simple routine tasks for an individual who is under the age of 55. R. 72. Based on these assumptions, the VE testified that the hypothetical claimant could perform work as (1) a Small Parts Assembler, for which there are approximately 196,000 positions in the United States, (2) an Inspector and Hand Packager, for which there are approximately 314,000 positions in the United States, or (3) a Shipping and Receiving Weight, for which there are approximately 72,000 positions in the United States. *Id*.

In a third hypothetical, the ALJ asked the VE to assume the same limitations as the second hypothetical, except the individual can only stand or walk four hours out of an eight-hour workday. *Id*. The VE testified that the hypothetical claimant would have the same three jobs available to him as above but would reduce the number of positions available for each by 75% to account for employers who would allow for limited standing and walking. *Id*. at 72–73.

In a fourth hypothetical, the ALJ asked the VE to assume the same limitations as the second and third hypotheticals, except the individual can only lift and carry

5

ten pounds. R. 73. The VE testified that adding that limitation would eliminate the jobs provided above and "all light jobs." *Id*. When asked by the ALJ whether an individual who was off task twenty percent of the workday beyond normal breaks would preclude all jobs, the VE testified that it would. *Id*. Finally, when asked whether an individual who was absent on average two days a month would preclude all jobs, the VE testified that it would. R. 74.

Based on the testimony and Mr. Castro's medical records, on August 14, 2020, the ALJ issued a partially favorable decision finding that Mr. Castro had become disabled on July 27, 2020, but not prior to that date. R. 15–38. Mr. Castro appealed the ALJ's decision to the Appeals Council (R. 198–204) and on January 29, 2021, the Appeals Council denied Mr. Castro's request for review, rendering the ALJ's decision the "final decision." R. 1–6. Mr. Castro filed this action in the District Court, requesting judicial review of the ALJ's decision. ECF No. 1. Mr. Castro seeks reversal of the ALJ's decision that he was not disabled prior to July 27, 2020, on the grounds that (1) the ALJ committed reversible error when he failed to apply the correct legal standards to Mr. Castro's testimony regarding his pain and limitations, and (2) Mr. Castro is entitled to a legitimate valid hearing before an ALJ who has lawful authority to hear and decide his claim based on valid legal authority. ECF No. 14 at 4, 8.

## ADMINISTRATIVE RECORD

The medical evidence submitted to the ALJ for disability determination begins on 2009, when Mr. Castro had an MRI of his lumbosacral spine due to back pain. R.

333. Between 2014 and 2018, Mr. Castro frequently saw doctors for a multitude of symptoms including dizziness, numbness over his right cheek bone, nausea, diarrhea, anxiety-related symptoms, depression-related symptoms, a leg infection, leg swelling, extreme fatigue, stomach pains, malnutrition, etc. R. 850–1046. The medical records from the period from 2009 through 2020 also indicate that he suffered a heart attack, had a cardiac bypass, was diagnosed with Type II Diabetes, coronary artery disease, obesity, degenerative disc disease, major depressive disorder, generalized anxiety disorder, bipolar disorder, and PTSD, had a gastric sleeve procedure in January 2017 after which he reported losing a significant amount of weight, a pulmonary embolism in November 2018, and had a pacemaker installed in February 2020. R. 357, 850, 861, 874, 877.

## STANDARD OF REVIEW

This Court's review of the factual findings in disability cases is limited to an inquiry into whether substantial evidence exists to support the ALJ's findings and whether the correct legal standards were applied. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Lewis v. Callahan*, 125 F.3d 1436 (11th Cir. 1997). Substantial evidence has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)). If the ALJ's decision is supported by substantial competent evidence from the record as a whole, a court will not disturb that decision. Neither may a court reweigh the evidence nor substitute its judgment for that of the ALJ. *See*

*Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir. 1996). *See also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). Although factual findings enjoy such deference, a court is free to review the ALJ's legal analysis and conclusions *de novo*. *See Ingram v. Comm'r*, 496 F.3d 1253, 1260 (11th Cir. 2007).

## DISCUSSION

### I.     The Five Step Framework

A person who applies for social security disability benefits must prove his disability before being entitled to those benefits. *See* 20 C.F.R. § 404.1512. In determining disability, the ALJ considers a five-step evaluation process. *See* 20 C.F.R. § 404.1520. First, the claimant must prove he is not currently engaged in substantial gainful activity. *Id.* Second, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . ." *Id.* Third, the claimant must show he is disabled by proving that his impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1. *Id.* Before considering step four, the ALJ must determine the claimant's residual functional capacity (RFC), meaning his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. *Id.* At step four, the claimant bears the burden of proving that he does not have the RFC to perform past relevant work. *Id.* If the claimant is successful at all four of the preceding steps, the burden shifts at step five to the Commissioner to prove, considering claimant's RFC, age, education, and past work experience, that he is capable of performing other work. *Id.* If the Commissioner proves other work

exists which the claimant can perform, the claimant is given the chance to prove that he cannot, in fact, perform that work. *Id.*

## II. Whether the ALJ applied to the correct legal standards to Mr. Castro's testimony regarding his pain and limitations.

Applying the five-step framework, the ALJ first determined that Mr. Castro met the insured status requirements of the Social Security Act through December 31, 2022 and had not engaged in substantial gainful activity since the alleged onset date of May 30, 2018. R. 22. The ALJ next found that Mr. Castro suffered from the following severe impairments: coronary artery disease with history of coronary artery bypass grafting (CABG), and status-post implantable cardioverter-defibrillator (ICD) implant, history of sleeve gastrectomy, degenerative disc disease of the lumbar spine, major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder (PTSD). *Id.* He also found that Mr. Castro suffered from the following non-severe impairments: degenerative disc disease of the cervical spine, degenerative joint disease of the left knee, pulmonary embolism, hypertension, hyperlipidemia, herpes, obesity, cocaine use disorder, and history of ETOH use disorder. R. 23.

The ALJ determined at step three that Mr. Castro did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. After review of the entire record, the ALJ found that Mr. Castro had

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except for the following limitations: occasionally climbing ramps and stairs; never ladders, ropes or scaffolds; occasionally, balancing, stooping, kneeling, crouching and crawling. The claimant can never work at unprotected heights or around moving

> mechanical parts; occasionally be exposed to humidity and wetness; never be exposed to extreme heat; and occasionally be exposed to dust, odors and fumes, and other pulmonary irritants. The claimant can occasionally work in vibration. Due to moderate limitations in maintaining concentration, persistence or pace, the claimant is limited to understanding, remembering and carrying out simple and routine tasks.

R. 25.

The ALJ noted that there was no clinical evidence that Mr. Castro's non-severe impairments, whether considered singularly or in combination, would further reduce his overall residual functional capacity. R. 23. The ALJ also noted that he did not find clinical evidence that Mr. Castro's obesity would further reduce his overall residual functional capacity. *Id.* Furthermore, in determining Mr. Castro's residual functional capacity, the ALJ noted that he did not take into account bipolar disorder or ADHD because there was no evidence that those conditions were definitively diagnosed or consistently treated for any durational period of 12 months or more. *Id.* The ALJ's report details his consideration of Mr. Castro's subjective complaints of symptoms and whether they could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529. R. 25–30. He accurately articulated the analysis for evaluating Mr. Castro's symptoms:

> [I]t must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence,

and limited effects of the claimant's symptoms to determine the extent
to which they limit the claimant's work-related activities. For this
purpose, whenever statements about the intensity, persistence, or
functionally limiting effects of pain or other symptoms are not
substantiated by objective medical evidence, I considered other evidence
in the record to determine if the claimant's symptoms limited the ability
to do work-related activities.

R. 25.

Ultimately, the ALJ held that although Mr. Castro's medically determinable
impairments could reasonably be expected to cause some symptoms, "his statements
concerning the intensity, persistence and limiting effects of these symptoms are not
fully supported" by the record evidence. *Id*. The ALJ gave a detailed accounting of
Mr. Castro's medical history beginning with his heart attack in 2014, through his
most recent appointment for a medication refill in May 2020. R. 25–29. In evaluating
the record evidence, the ALJ stated in his report that he "did not defer or give any
specific evidentiary weight, including controlling weight, to any prior administrative
medical finding(s) or medical opinion(s), including those from the claimant's medical
sources" and "fully considered the medical opinions and prior administrative medical
findings." R. 25.

The ALJ also noted that the assessment performed by the State Agency
medical consultants, which found that Mr. Castro retained the residual functional
capacity for light work, with postural limitations of occasionally and never, and some
environmental limitations, was supported and consistent with the evidence of record.
R. 27.

Consistent with testimony from the VE, the ALJ concluded that Mr. Castro
could not perform his past relevant work as a concrete mixing truck driver and heavy

11

equipment operator. R. 30. The ALJ also concluded, based on the testimony of the VE, that there are jobs that Mr. Castro could perform that existed in significant numbers in the national economy. *Id*. Accordingly, the ALJ found that prior to July 27, 2020, when Mr. Castro turned 55, he was not disabled. *Id*.  The ALJ held that when Mr. Castro turned 55, his age category changed to "advanced age" and Medical-Vocational Rule 202.02 required a finding of "disabled." R. 31.

Mr. Castro disagrees with the ALJ's determination and seeks reversal of the ALJ's decision on the grounds that the ALJ failed to apply the correct legal standards to Mr. Castro's testimony regarding his pain and limitations and his opinion is, therefore, not supported by substantial record evidence. ECF No. 14.

I disagree with Mr. Castro and find that the ALJ applied the appropriate legal standard to assess Mr. Castro's testimony regarding his pain and limitations. I further find that the ALJ's decision is supported by substantial record evidence.

The Eleventh Circuit has articulated the three-part "pain standard" that applies when a claimant attempts to establish disability through his or her own testimony concerning pain or other subjective symptoms:

> [The three-party "pain standard"] requires evidence of an underlying medical condition, and either (A) objective medical evidence that confirms the severity of the alleged pain stemming from that condition, or (B) that the objectively determined medical condition is so severe that it can reasonably be expected to cause the alleged pain. *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir.2002); *see Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991) (stating that this "standard also applies to complaints of subjective conditions other than pain"). "The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223.

12

> When the medical signs and laboratory findings establish that the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate the intensity and persistence of a claimant's symptoms and the extent to which those symptoms limit the claimant's capacity for work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); Social Security Regulation 96–7p ("SSR 96–7p") at 2. In doing so, the ALJ is to consider the objective medical evidence and other evidence provided by the claimant and her treating and nontreating sources concerning what may precipitate or aggravate the claimant's symptoms, what medications, treatment or methods are used to alleviate the symptoms, and how the symptoms affect the claimant's daily living. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96–7p at 3. The ALJ's credibility finding must be grounded in the evidence and contain specific reasons that are supported by the record evidence. SSR 96–7p at 4.

*Mack v. Comm'r, Soc. Sec. Admin.*, 420 Fed. App'x 881, 883 (11th Cir. 2011).

"[C]redibility determinations are the province of the ALJ, and [a court] will not disturb a clearly articulated credibility finding supported by substantial evidence." *Alvarado v. Comm'r, Soc. Sec. Admin.*, No. 19-24843-CIV, 2021 WL 248000, at *3 (S.D. Fla. Jan. 5, 2021) (J. Goodman) (quoting *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (finding ALJ's credibility determination to be supported by substantial evidence where ALJ "pointed to specific reasons for discrediting [the claimant's] subjective complaints of disabling pain")). *See also Wilson*, 284 F.3d at1226 ("[W]e find that the ALJ made a reasonable decision to reject [the claimant's] subjective testimony, articulating, in detail, the contrary evidence as his reasons for doing so.").

Here, the ALJ evaluated the alleged intensity and persistence of Mr. Castro's alleged symptoms and found that the evidence does not support the intensity, persistence, and limiting effects of the symptoms Mr. Castro described. R. 25. In evaluating Mr. Castro's subjective complaints, the ALJ analyzed his objective medical

records. R. 27–30; *see* 20 C.F.R. § 404.1529(c)(2) (providing that the ALJ may consider the objective medical evidence in evaluating a claimant's subjective complaints). The ALJ specifically noted the following regarding his review of Mr. Castro's medical records:

- In April 2017 Mr. Castro was seen for a follow-up for his gastric sleeve surgery. He had lost around 55 points; his blood pressure was normal. R. 27.

- In September 2017 he had a CT scan of his abdomen due to complaints of vomiting. The results noted some diffuse thickening of the urinary bladder wall but were otherwise within normal limits. *Id*.

- In October 2017, Mr. Castro went to the ER for suicidal ideation threats. He was intoxicated at the time and was assessed with depression and alcohol abuse. He also had an x-ray of his knee due to some complaints of knee pain. The results showed only mild osteoarthritis of the left patellofemoral joint with no evidence of further treatment for either the knee pain or mental health complaints. All other physical and mental exams were within normal limits. *Id*.

- In March 2018, Mr. Castro was seen for a urinary tract infection that he had for one day. Although he reported weakness with stomach pain, a physical exam showed no significant findings. His blood pressure was normal and urinalyses was within normal limits. R. 27–28.

- Throughout January 2019, Mr. Castro had several physical and mental exams, all of which were within normal limits, despite Mr. Castro's subjective complaints. R. 28.

- In July 2018, Mr. Castro went to the emergency room for pain in his neck and mid back, coughing, and lung pain for three days. A physical exam revealed oxygen saturation was SpO2 97%, an EKG showed normal sinus rhythm, and a chest x-ray was normal. The doctor reported Mr. Castro may have possible early pneumonia, but there was no evidence of further complications. *Id.*

- In August 2018, Mr. Castro reported to the doctor for a follow-up for diabetes, coronary artery disease, hypertension, and history of gastric sleeve. The notes indicate that Mr. Castro was not compliant with medications. His physical and mental exams were within normal limits. *Id.*

- In November 2018, Mr. Castro had a CT scan of his abdomen that showed mild degenerative changes of the lumbar spine, hepatic steatosis, status-post sleeve gastrectomy, but was otherwise unremarkable. *Id.*

- In November 2018, Mr. Castro was admitted to the hospital for a pulmonary right lower left infarct. The physical exam revealed a slow and cautious gait, but his lung, cardiac, and mental status exams were all within normal limits. *Id.*

15

- In follow-up treatment notes indicate that his blood pressure and oxygen levels were normal with the remainder of the physical exam being within normal limits. He was diagnosed with pre-eclampsia, coronary artery disease, diabetes mellitus II, and anxiety, however there was no reported evidence of any end organ damage of sensory loss. *Id.*

- In December 2018, he reported in a follow-up exam that he had epigastric pain and nausea, which after a CT scan, were noted as due to non-compliance of overeating and self-discontinuation of warfarin. His upper GI series was unremarkable. *Id.*

- In March 2019, Mr. Castro was admitted to the emergency room with complaints of chest pain and left arm numbness. An EKG was negative and physical exam revealed no weakness or sensory loss in the left upper extremity. Hypertension was controlled and a chest x-ray came back normal. *Id.*

- In June 2019, Mr. Castro was seen for a cardiovascular evaluation after reported chest pressure that worsened with exertion. His EKG was abnormal, however, his blood pressure was normal, his oxygen saturation was 99%, and his cardiovascular and lung exams were within normal limits. An Echo that same month showed LVEF 30%, but no chest pain or ischemia and a nuclear stress test noted no chest pain or ischemia. R. 28–29.

- In follow-up appointments through September 2019, his doctors reported that Mr. Castro was not compliant with medications and other treatment recommendations such as a life vest. R. 29.

- At an annual exam in February 2020, Mr. Castro reported body aches, although his physical exam was within normal limits and his blood pressure was normal. He reported that he was not taking the medications prescribed to him. *Id*.

- In March 2020, Mr. Castro reported mild whole-body fatigue, shortness of breath with exertion that improved with rest, rib and back pain. His physical exam was within normal limits. Overall, he reported that he felt fine. Although his blood pressure was slightly low, Mr. Castro was still non-compliant with medications and consistent follow-ups. *Id*.

- In April 2020, Mr. Castro had a cardiac follow-up where he continued to report that he had stopped taking a majority of his medications. At this appointment, he stated he had stopped taking his medications due to stomach issues. The report indicates that he was doing well from a cardiac standpoint and that Mr. Castro self-reported that he tried to walk a lot and had not experienced any heart failure symptoms or shocks from his ICD implant. *Id*.

- In May 2020, Mr. Castro was seen for medication refills where he reported depression and was diagnosed with bipolar disorder, however,

there were further information shedding light on the severity or duration of his symptoms. *Id.*

After describing the medical records in detail, the ALJ summarized his findings as follows:

> Based on the foregoing, I find that the claimant has the above residual functional capacity assessment, which is supported by the overall evidence of record, including the persuasiveness, supportability and consistency. The evidence as a whole establishes a treatment history for the claimant's severe and non-severe impairments, but also establishes a significant history of non-compliance with medications and follow-ups. Although the claimant reported the inability to afford medications, I note he was able to afford and continue smoking, and some alcohol abuse, as well as some cocaine use through 2020, despite his testimony of discontinuance a few years ago. In any event, while I am not finding that DA&A is material, there is evidence of alcohol use, cocaine use and non-compliance with medications and follow-up that caused some periods of deterioration in the claimant's overall health conditions. This is evidenced by his reports of feeling fine and well, more recently when he was compliant with medications. Thus, there is no clinical evidence to support a greater degree of functional limitations than assessed by the State Agency's for a restricted range of light work.

R. 29–30.

Mr. Castro argues that the ALJ's credibility determination is improper due to his reliance on Mr. Castro's non-compliance with medications and follow-ups. Social Security regulations provide that an individual's refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability. See 20 C.F.R. § 416.930(b). *See, e.g., Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) ("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." (footnote omitted)). I agree with Mr. Castro that, generally, poverty constitutes a good reason and excuses noncompliance. *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988). However, this argument is misplaced

18

in this case. The ALJ did not deny Plaintiff benefits on the basis that he failed to follow prescribed treatment. *See id.* ("In order to deny benefits on the ground of failure to follow prescribed treatment, the ALJ must find that had the claimant followed the prescribed treatment, the claimant's ability to work would have been restored."). *See also*, *Wickline v. Saul*, No. 20-14056-CIV, 2021 WL 862319, at *6 (S.D. Fla. Feb. 16, 2021) (J. Maynard). Instead, the ALJ cited to Mr. Castro's non-compliance with medications and follow-ups as a specific example of why he did not find Mr. Castro's testimony about the severity of his alleged symptoms to be credible. In other words, the ALJ did not find that because Mr. Castro was not taking his medication or attending follow-up visits, he was not disabled. The ALJ found that Mr. Castro's testimony about his subjective complaints was not credible. The ALJ explained that the reason Mr. Castro's non-compliance with medications and follow-ups was a sticking point for credibility, is that although he testified that he was unable to afford the medications, a review of the record evidence establishes that during the periods he allegedly could not afford medication, he was spending money on cigarettes and alcohol. The ALJ specifically notes in his decision that he did not find Mr. Castro's drug and alcohol use to be material, however, he did consider it when determining whether Mr. Castro's testimony about the reason for treatment non-compliance was credible. R. 30.[2]

_____

[2] I note that in addition to noting that Mr. Castro continued to smoke and abuse alcohol during periods of medication non-compliance, the ALJ also noted that Mr. Castro was using cocaine through 2020, despite his testimony to the contrary. The Commissioner concedes in its Motion for Summary Judgement that "there are no indications in the medical record that Plaintiff used cocaine after entering

Furthermore, Mr. Castro's non-compliance with medication and follow-ups was not the sole reason for the ALJ's finding that Mr. Castro's testimony about subjective complaints was not credible. The ALJ noted, as described in detail above, that during the period at issue, doctors performed a multitude of tests and physical examinations on Mr. Castro, many of which yielded results within the normal range: his blood pressure was normal more often than not, results of his CT scan were unremarkable, he had multiple normal chest x-rays, and the cardiovascular and lung exams were within normal limits as were his urinalysis results.

Given that the ALJ has provided specific reasons for discrediting Mr. Castro's subjective complaints, supported by the ample evidence described above, I find that the ALJ made a reasonable decision to reject Mr. Castro's subjective testimony, articulating the contrary evidence as his reasons for doing so. *Wilson*, 284 F.3d 1219, 1226 (11th Cir. 2002). I do not find it appropriate to "disturb a clearly articulated credibility finding supported by substantial evidence." *Mitchell*, 771 F.3d at 782.

Accordingly, I recommend that Mr. Castro's request for remand on the basis that the ALJ's opinion is not supported by substantial record evidence because he failed to apply the correct legal standards to Mr. Castro's testimony regarding his pain and limitations should be DENIED.

---

rehabilitation in 2019." ECF No. 15 at 8 n. 3. However, I agree with the Commissioner that the ALJ's error in relying on that falsity is harmless, as the ALJ did not rely on Mr. Castro's substance abuse to find him not disabled. In sum, Mr. Castro has not shown that the error was harmful, as is his burden as the party attacking the ALJ's determination. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

### III.    Whether the Appointment of Andrew Saul Violates Separation of Powers and Renders the ALJ's Decision Constitutionally Defective

Mr. Castro asserts a constitutional challenge to the Social Security Commissioner's authority based on Supreme Court case *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (Jun. 20, 2020). ECF No. 14 at 8. In *Seila Law*, the Supreme Court found that the structure of the Consumer Financial Protection Bureau ("CFPB") violated the separation of powers. *Id*. at 2191. The Court ultimately held that, in light of the President's "ultimate responsibility" for use of the executive power and "active obligation to supervise" the officers to whom he has delegated authority, limitations on the President's ability to remove the Director of the CFPB thwarts that responsibility. *Id*. at 2203–04 ("The CFPB Director's insulation from removal by an accountable President . . . render[s] the agency's structure unconstitutional."). More recently, the Supreme Court cemented its findings as to the President's removal powers in *Collins v. Yellen*, 141 S. Ct. 1761, 1784 (2021). There, the Court held that a similar statutory provision protecting the Director of the Federal Housing Finance Authority ("FHFA") from removal except for cause was a violation of the separation of powers. *Id*. at 1783.

In *Collins*, the Court also held that in challenging a statutory removal restriction, a plaintiff need not show that the claimed injury is traceable to the challenged provision of law to show standing. *Id*. at 1779. Instead, it is sufficient for a plaintiff to allege injury based on the "allegedly unlawful conduct of the defendant." *Id*. In order to obtain retrospective relief, however, a plaintiff must show that the unconstitutional provision in question "inflict[ed] compensable harm." *Id*. at 1789.

The Court opined that an example of such harm could be if, for example, the President attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal, or if the President publicly stated displeasure with the Director and that he would remove the Director if not for the statute. *Id.* at 1788–89. Ultimately, the Court remanded the case for resolution of that very question: whether the provision had inflicted compensable harm on plaintiffs. *Id.* at 1789.

Applying the holdings in *Seila Law* and *Collins* to the Commissioner of Social Security, and in keeping with holdings in districts throughout the country, I agree with Mr. Castro that the provision for removal of the Commissioner, 41 U.S.C. § 902(a)(3), "suffers from the same defect as the removal provisions at issue in *Seila Law* and *Collins*" and therefore violates the separation of powers. *See Perez-Kocher v. Comm'r of Soc. Sec.*, No. 6:20-cv-2357, 2021 WL 6334838, at *3 (M.D. Fla. Nov. 23, 2021). *See also Tosland v. Comm'r of Soc. Sec.*, No. 3:20-cv-06085-JRC, 2021 WL 5356721, at *3 (W.D. Wash. Nov. 17, 2021) (finding that 41 U.S.C. § 902(a)(3) violates separation of powers; *Young v. Comm'r of Soc. Sec.*, No. C21-5207-BAT, 2021 WL 5177363, at *5 (W.D. Wash. Nov. 8, 2021) (finding same); *Tafoya v. Kijakazi*, No. 21-CV-00871-REB, 2021 WL 3269640, at *3 (D. Colo. July 29, 2021). However, to warrant retrospective relief such as remand, Mr. Castro must show that the removal restriction inflicted compensable harm on him. *Collins*, 141 S. Ct. at 1789.

The Commissioner argues that Mr. Castro has not shown that the removal restriction actually caused him harm for two reasons: (1) the ALJ who issued the final

decision denying Mr. Castro's claim was not appointed by a Commissioner subject to
Section 902(a)(3)'s removal restriction; the ALJ had his appointment ratified by an
Acting Commissioner of Social Security—whom the President could have removed
from that role at will, at any time (ECF No. 15 at 9–12), and (2) Mr. Castro cannot
show that Section 902(a)(3)'s removal restriction inflicted compensable harm on him
(*Id*. at 12–16).

*Ratification of the ALJ's Appointment*

Mr. Castro does not refute the Commissioner's claim that "the ALJ who issued
the final decision denying Plaintiff's claim was not appointed by a Commissioner
subject to Section 902(a)(3)'s removal restriction. Rather, the ALJ had his
appointment ratified by an Acting Commissioner of Social Security—whom the
President could have removed from that role at will, at any time." *Id*. at 5. Instead,
Mr. Castro argues that the Commissioner's argument misses the mark and ignores
his constitutional argument that "challenges not the adjudicators' appointments, but
rather the delegation of authority under which they adjudicated and then decided
this case." ECF No. 16 at 3. I disagree. In *Perez-Kocher*, Magistrate Judge Kidd ruled
in favor of the Commissioner on the same argument they raise here:

> In *Collins*, the Supreme Court addressed the removal of an Acting
> Director and found that "if the statute does not restrict the removal of
> an Acting Director, any harm resulting from actions taken under an
> Acting Director would not be attributable to a constitutional violation."
> *Collins*, 141 S. Ct. at 1781. Section 902(a)(3) restricts only the removal
> of the Commissioner and does not reference an acting Commissioner. As
> such, the Acting Commissioner's appointment was constitutional. *See
> id*. at 1782 ("When a statute does not limit the President's power to
> remove an agency head, we generally presume that the officer serves at
> the President's pleasure") (finding that the Recovery Act's removal

> statute does not extend to an Acting Director). Thus, Acting Commissioner Nancy Berryhill was not subject to the unconstitutional removal provision on which Plaintiff bases his claim, and any ratification of an ALJ by Nancy Berryhill would make that appointment constitutional. *Boger v. Kijakazi*, No. 1:20-cv-331, 2021 WL 5023141, at *n.4 (W.D.N.C. Oct. 28, 2021) (unpublished) ("Indeed, [the p]laintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the] ALJ [in question] was appointed by an Acting Commissioner of Social Security who could be removed from that office at the President's discretion.").

2021 WL 6334838, at *6. Here, like in *Perez-Kocher*, the ALJ's appointment was ratified by the Acting Commissioner of Social Security. "Therefore, even if the ALJ was appointed by Commissioner Saul, that appointment was later ratified by the Acting Commissioner, who was not subject to the unconstitutional structure. Therefore, the ALJ's appointment, as ratified, is valid." *Id*. It follows that Section 902(a)(3) did not affect Mr. Castro's case, thus eliminating any nexus between the removal restriction and the alleged harm. For that reason alone, and in keeping with the requirements for remand outlined in *Collins*, I find that Mr. Castro's constitutional claim fails.

*Compensable harm*

The Commissioner further argues that under *Collins*, Mr. Castro "cannot show that the removal restriction 'inflict[ed] compensable harm' on him." ECF No. 17 at 14. The Commissioner is correct in its argument. Mr. Castro has not sufficiently alleged that then-Commissioner Saul's unconstitutional appointment and tenure resulted in compensable harm. Mr. Castro argues that he suffered the following specific injuries as a result of the Commissioner's violation of his constitutional rights:

- He did not receive a constitutionally valid hearing and adjudication from an ALJ to which she was entitled.
- He did not receive a constitutionally valid decision from an ALJ to which she was entitled.
- He received a partially favorable decision from this constitutionally illicit ALJ adjudication process.
- He did not receive a constitutionally valid process from the SSA's Appeals Council to which she was entitled.
- He did not receive a constitutionally valid determination by the Appeals Council to which she was entitled.

ECF No. 14 at 10.

Magistrate Judge Lammens addressed an identical argument regarding compensable harm from the plaintiff in *Vickery v. Comm'r of Soc. Sec.*, No. 5:21-cv-122-PRL, 2022 WL 252464, at *4 (M.D. Fla. Jan. 26, 2022), and I agree with his reasoning and conclusion. There, the plaintiff's alleged injuries were as follows:

- She did not receive a constitutionally valid hearing and adjudication from an ALJ to which she was entitled.
- She did not receive a constitutionally valid decision from an ALJ to which she was entitled.
- She received an unfavorable decision from this constitutionally illicit ALJ adjudication process.
- She did not receive a constitutionally valid process from the SSA's Appeals Council to which she was entitled.
- She did not receive a constitutionally valid determination by the Appeals Council to which she was entitled.

*Id*. Judge Lammens found the alleged specific injuries to be insufficient:

However, in addition to not being pled in the complaint, Plaintiff's contentions regarding her purported injuries are conclusory. She must set forth facts showing plausible harm as a result of the Commissioner's statutory removal protections. In this instance, following the examples set forth in *Collins*, there are no allegations to suggest an effort by the President to remove the Acting Commissioner that were rebuffed by 42 U.S.C. § 902(a)(3). Because Plaintiff has not shown that she was injured by the removal protection provision she cannot demonstrate that the provision itself "inflict[ed] compensable harm" on her. *Collins*, 141 S. Ct.

at 1789; *see also Tibbetts v. Comm'r of Soc. Sec.*, No. 2:20-CV-872-SPC-MRM, 2021 WL 6297530, at *6 (M.D. Fla. Dec. 21, 2021) ("[E]ven assuming arguendo that the removal provision is unconstitutional, it would not necessitate a rehearing of Plaintiff's claim because the provision is severable and there is no evidence to suggest a nexus between the removal provision and a compensable harm to Plaintiff.").

This issue is not an issue of first impression. This Court and other district courts throughout the country have decided this issue in the same or similar context in recent months and have come to the same conclusion for the same reasons. In *Tibbetts v. Comm'r of Soc. Sec.*, No. 2:20-CV-872-SPC-MRM, 2021 WL 6297530, at *6 (M.D. Fla. Dec. 21, 2021), this Court found that, even assuming 42 U.S.C. § 902(a)(3)'s removal provision is unconstitutional, "the removal provision does not necessitate remand or a rehearing of Plaintiff's claim." Similarly, in *Perez-Kocher v. Comm'r of Soc. Sec.*, No. 6:20-CV-2357-GKS-EJK, 2021 WL 6334838, at *4 (M.D. Fla. Nov. 23, 2021), this Court found that, because the plaintiff could not establish that the tenure provision caused compensable harm, the plaintiff had failed to state a claim upon which relief could be granted.

Further, in *Benavidez v. Kijakazi*, No. CV 20-990 SCY, 2021 WL 6062715, at *4 (D.N.M. Dec. 22, 2021), the court granted the Commissioner's motion to dismiss Plaintiff's constitutional challenge based on *Selia Law LLC*, finding that the plaintiff had not sufficiently alleged facts showing plausible harm caused by the removal provision. Similarly, in *Nathanial H. v. Kijakazi*, No. 6:19-CV-01280-AA, 2021 WL 5921377, at *6 (D. Or. Dec. 15, 2021), the court held that, even though the removal restriction of Section 902(a)(3) violated the separation of powers, it did not independently require reversal of the ALJ's decision. In reaching that conclusion, the court found that the removal restriction did not render the Acting Commissioner's appointment void or invalidate the Acting Commissioner's authority. *Id*. at *5. The court also rejected plaintiff's arguments (similar to Plaintiff's here) that he suffered various injuries, such as deprivation of his right to a constitutional decision, due to the unconstitutional nature of the removal restriction. *Id*. at *6.

And in a recent case with similar facts to the instant case, *Helms v. Comm'r of Soc. Sec.*, No. 3:20-CV-589-MOC, 2021 WL 5710096, at *3 (W.D.N.C. Dec. 1, 2021), the court granted the Commissioner's motion for summary judgment and determined that even if plaintiff had somehow been injured by the ALJ's decision, the ratification of the ALJ's appointment by Acting Commissioner Berryhill "adequately cured any such injury," noting that the Acting Commissioner was not protected

from removal from office. The court also found that it was implausible that the Commissioner's protection from removal from office, "whether constitutional or not," could have affected the ALJ's decision. *Id.*

Notably, Plaintiff has not cited a single case in which a court held that the removal restriction in Section 902(a)(3) requires reversal of an ALJ's decision. *See also Nathanial H. v. Kijakazi*, 2021 WL 5921377 at *6 n. 4 ("Plaintiff does not cite, nor has this court found, any decision from another court that has reached a different conclusion on the merits of a plaintiff's constitutional claim regarding section 902(a)(3).").

*Id.* at* 4–5.

As in *Vickery*, Mr. Castro has neither shown a nexus between the removal restrictions and his claim, nor has he plausibly alleged that the statutory tenure protection affected the ALJ's decision or caused him compensable harm. The holding of *Collins*, as well as the above cited cases, leads me to recommend that the Court DENY Mr. Castro's Motion for Summary Judgment on the grounds that his constitutional rights were violated.[3]

## **REPORT AND RECOMMENDATION**

For the foregoing reasons, the undersigned **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Summary Judgment (ECF No. 14), **GRANT** Defendant's Motion for Summary Judgment (ECF No. 15), and **AFFIRM** the decision of the ALJ.

---

[3] To reinforce its position that Mr. Castro's constitutional rights were not violated by the removal restriction, the Commissioner also argues that the rehearing request should be denied under the harmless error doctrine, the *de facto* officer doctrine, the rule of necessity, and due to "broad prudential considerations." ECF No. 15 at 16–20. However, because I find Mr. Castro's constitutional rights were not violated and rehearing is not warranted on other, more compelling, grounds, I need not address the supplemental arguments made by the Commissioner.

## <u>NOTICE OF RIGHT TO OBJECT</u>

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Aileen M. Cannon, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**DONE AND SUBMITTED** in Chambers this 14th day of April, 2022, at West Palm Beach in the Southern District of Florida.

BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE